THE STATE OF IOWA on the Relation of CHESTER A.
BARKER and others, Appellee, v. R. E. MEEK.

**Counties:** REMOVAL OF OFFICERS: WILFUL MISCONDUCT: GOOD FAITH
OF OFFICER: EVIDENCE: SUBMISSION OF ISSUE. The term wilful
misconduct in office, as used in the statute providing that any
county officer may be removed for wilful misconduct or malad-
ministration in office, is not applicable to every case of miscon-
duct, nor to every mistake or departure from the strict letter
of the law; but only to wilful wrongs, or omissions on the part
of such officer. So that the question of the good faith and inno-
cence of intentional wrong becomes important, and evidence upon
that question is admissible.
In this action it appeared that defendant, a county treasurer, re-
ceived payment of taxes after the close of the semiannual tax-
paying period, without exacting the penalty for delayed payment, in
accordance with the long established custom and believing the
practice to be legal. There was no corrupt agreement of any
kind between him and the taxpayers and he received no profit
from the transaction. *Held,* that the wilfulness of · defendant's
act, if wrongful, was a question for the jury, and a judgment of
ouster should not have been entered by the court without a sub-
mission of the issue.

**Same.** While the statutes seem to contemplate that every taxpayer
shall appear in person at· the office of the treasurer and pay his
taxes, still a treasurer is not to be condemned for wilful miscon-
duct in accepting payment of taxes, as if made to him in person,
when transmitted by· check or collected and paid· through local
banks, even though there may be a delay of a few days in com-
pleting the actual transmisison of the money.
LADD, J., and DEEMER, C. J., dissenting.

*Appeal from Van Buren District Court.*—HON. D. M.
ANDERSON, Judge.

MONDAY, OCTOBER 24, 1910.

ACTION to remove defendant from office as county

treasurer. There was a directed verdict of guilty, on which judgment of removal was entered, and defendant appeals.—*Reversed.*

*Walker & McBeth* and *Mitchell & Hunter,* for appellant.

*Felix T. Hughes, William McNett,* and *E. L. McCoid,* for appellee.

WEAVER, J.—The defendant being the duly elected and acting treasurer of Van Buren County, this action was brought upon the complaint of certain citizens of said county to remove him from office. The proceeding was instituted under Code, section 1251, which provides that any county officer may be removed for "willful misconduct or maladministration in office." The action thus provided for is one at law and triable to a jury. The petition of the plaintiffs charged many alleged acts of misconduct and maladministration, but, upon the hearing, they were all dismissed by the trial court as having no support in the evidence except the one specification hereinafter more particularly stated, and upon this specification a verdict of guilty was directed by the court and judgment of removal entered. From this judgment the defendant appeals.

The allegation of willful misconduct in office which is relied upon to sustain the action of the trial court is based upon the fact that after the close of the semiannual tax-paying period ending September 30, 1907, the appellant continued for several days to accept payment of taxes without exacting or collecting the penalty which the statute imposes. On the trial the appellant freely admitted that from September 30th to noon of October 8th of the year above mentioned he did receive the taxes of all such taxpayers as appeared for that purpose, and receipted for the same as if paid on the former date. Viewing this admission as de-

cisive of the case, the court excluded all evidence tending
to show good faith and absence of evil motive on appellant's
part, and peremptorily directed a verdict of guilty, but
suspended execution of the order of removal pending an
appeal to this court.

The sole question presented is whether the acts thus
freely admitted constitute "willful misconduct in office"
within the meaning of the statute.    What is the meaning
of "willful misconduct" as that phrase is
here employed?    Manifestly it is not applica-
ble to every case of misconduct, nor to every
mistake, or every departure from the strict
letter of the law defining the officer's duties,
but only to willful wrongs or omissions on

1. COUNTIES: re-
moval of of-
ficers: willful
misconduct:
good faith
of officer:
evidence:
submission
of issue.

his part.    The word "willful," like most other words in our
language, is of somewhat varied signification according to
its context and the nature of the subject under discussion
or treatment.    Frequently it is used as nearly or quite
synonymous with "voluntary" or "intentional," and evi-
dently this is the interpretation given it by the trial court
in the case before us.    But when employed in statutes,
especially in statutes of a penal character, it is held with
but few exceptions to imply an evil or corrupt motive
or intent.    In *State v. Willing,* 129 Iowa, 72, this court
has said:    "Every voluntary act of a human being is
intentional, but, generally speaking, a voluntary act be-
comes willful in law only when it involves some degree
of conscious wrong or evil purpose upon part of the actor,
or at least an inexcusable carelessness on his part whether
the act be right or wrong."    So, also, the New York court:
"The word 'willful' in a statute means something more
than a voluntary act, and more also than an intentional
act when it is in fact wrongful.    It includes the idea of
an act intentionally done with a wrongful purpose or
with a design to injure another or one committed out of
mere wantonness or lawlessness."    *Wass v. Stephens,* 128

N. Y. 123 (28 N. E. 21). Speaking for the Supreme Court of Wisconsin, Chief Justice Dixon thus states the rule: "While the word 'willful' is sometimes so reduced or modified as to mean little more than plain 'intentionally' or 'designedly,' such is not its ordinary signification when used in criminal law and penal statutes. It is there most frequently understood, not in so mild a sense, but as conveying the idea of legal malice in a greater or less degree; that is as implying an evil intent without justifiable excuse." *State v. Preston,* 34 Wis. 675. The eminent Chief Justice Shaw puts it in these words: " 'Willful' as used in statutes means not merely voluntary, but with a bad purpose." *Commonwealth v. Kneeland,* 20 Pick. (Mass.) 220. "Willful disobedience" has been defined as "something more than a conscious failure to obey. It involves a wrongful or perverse disposition." *Shaver v. Ingham,* 58 Mich. 654 (26 N. W. 162, 55 Am. Rep. 712). Conduct may be voluntary, thoughtless, or even reckless, yet not necessarily willful. *Harrison v. State,* 37 Ala. 154. Nor does unlawfulness necessarily imply willfulness. *Wass v. Stephens, supra; Yeamans v. Nichols* (City Ct. N. Y.) 81 N. Y. Supp. 500. A statute of the United States regulating the business of distilling spirits provides a penalty for willful omission or neglect to observe the provisions of the revenue law. In *Felton v. United States,* 96 U. S. 699 (24 L. Ed. 875), a civil action was begun against Felton to recover the prescribed penalty. On the trial he requested the court to charge the jury that, if the acts charged were done in good faith, he was not liable upon the charge preferred. This request was refused, and the jury was told that, if the accused had designedly done the prohibited act, he was guilty as charged. On appeal this instruction was held erroneous. Chief Justice Fuller, delivering the opinion, says: "Doing or omitting to do a thing knowingly and willfully implies, not only knowledge of the thing, but a determination with a bad intent to

do it or to omit doing it. . . . All punitive legislation contemplates some relation between guilt and punishment. To inflict the latter where the former does not exist would shock the sense of justice of everyone." In *Evans v. United States,* 153 U. S. 584 (14 Sup. Ct. 934, 38 L. Ed. 830), construing a statute against the willful misapplication of the bank funds, the court says: "The allegation of the intent to defraud becomes material in the highest degree. In fact, the gravamen of the offense consists in the evil design with which the misapplication is made." The case of *Potter v. United States,* 155 U. S. 438 (15 Sup. Ct. 144, 39 L. Ed. 214), has reference to a statute forbidding the certification of a check by any national bank where the drawer has no funds on deposit with which to pay it. The defendant being charged with a willful violation of this act, the fact of the alleged certification for a person not having the required deposit was admitted, and, when the accused offered to prove facts tending to show that the act was done in good faith and without evil intent, the testimony was excluded. This ruling was held erroneous, and the judgment against the bank officer reversed. Speaking of the effect and meaning of the word "willful" in the statute, the court says it is not mere surplusage. "It means something. It implies on the part of the officer knowledge and a purpose to do wrong. Something more is required than an act of certification made in excess of the actual deposit, but in ignorance of that fact, or without any purpose to evade or disobey the mandates of the law." In a similar case—*Spurr v. United States,* 174 U. S. 728 (19 Sup. Ct. 812, 43 L. Ed. 1150)—these holdings were again approved and followed; the court saying: "While it is true that care must be taken not to weaken the wholesome provisions of the statutes designed to protect depositors and stockholders against the wrongdoings of banking officials, it is of equal importance that they should not be so construed as to make transactions

of such officials, carried on with the utmost honesty and in the sincere belief that no wrong was being done, criminal offenses, and subjecting them to severe punishments which may be imposed under those statutes. The wrongful intent is the essence of the crime." Indeed, the authorities upholding this view are too numerous to mention, and we take time to quote from leading cases thereon only because of the grossly unjust results which would follow our establishment of a precedent to the contrary. True, there are exceptional cases where the courts have held willfulness to be established by proof of the voluntary character of the act, but such of these cases as are not explainable from the peculiar circumstances under discussion or the peculiar language of the statute there being construed are opposed to the overwhelming weight of authority.

Thus far we have considered the use of the word "willful" in statutes of a penal character generally. Let us see now how the word is construed by the courts with reference to official misconduct. A statute of New York provides that a person who having served as an executive or administrative officer willfully exercises any of the function of his office after his right to do so has ceased, or willfully intrudes himself into an office to which he has not been duly elected, incurs a penalty as for a misdemeanor. A defendant being prosecuted under this act, the trial court charged the jury that, if defendant intended to do what he did do, then his act was willful within the meaning of the law, and this was held erroneous, in that "willfully" in the statute means more than voluntarily or intentionally—"it includes the idea of an act intentionally done with a wrongful purpose, or with design to injure another, or one committed out of mere wantonness or lawlessness." *People v. Bates,* 79 Hun, 584 (29 N. Y. Supp. 894). Under a Missouri statute providing a penalty for willful wrongs done under color of office, a justice of the peace was indicted, tried, and convicted. On

appeal the conviction was set aside, the court saying that the word "willful" must be restricted to such acts as are done with evil intent and without reasonable grounds to believe that the act was lawful. *State v. Grassle,* 74 Mo. App. 316.

In *Geddes v. Township,* 46 Mich. 316 (9 N. W. 431), the Michigan court denied the appeal of a school director from an order removing him from office for alleged misconduct; it appearing that the director offered no evidence in defense or in explanation of his conduct which was such as "might be regarded as willful and proceeding from some motive beyond a desire to do his duty." In *Triplett v. Munter,* 50 Cal. 644, action was brought to remove an officer for charging and collecting illegal fees, and the court there says the statute in question is highly penal in character, and, though it does not in terms require that the wrongful act must have been knowingly and corruptly done, it must be held that it is not intended to visit such result upon the officer unless the act was willful or corrupt. In *Smith v. Ling,* 68 Cal. 324 (9 Pac. 171), a petition for the removal of an officer is held fatally defective if it fails to allege that the unlawful act charged was knowingly, willfully, and corruptly done. In *State v. Alcorn,* 78 Tex. 387 (14 S. W. 663), it was sought to remove a county officer for willful violation of duty, and the court, refusing to enforce the forfeiture, says: "We are of the opinion that under the statute an act done or omitted can not be said to have been willful unless the officer believed it was his duty to do or omit the act and with such knowledge or belief obstinately, perversely, and, with intent to do wrong, acted or failed to act. . . . The statute is one penal in character, and must be construed as though it were one defining a crime and prescribing its punishment. If respondent violated an official duty whether it resulted from a willful act or not, he would be responsible to any person injured thereby, for the intent with which the act

was accompanied would not be a matter of inquiry, but, when it is sought to remove him on account of official' misconduct, *animus* becomes an important inquiry." In *State v. Scates,* 43 Kan. 330 (23 Pac. 479), an action to remove an officer, the decision concludes: "As a majority of the court do not find that any of the acts done by Scates were done corruptly, judgment will be rendered in his favor." In a similar proceeding in Louisiana a like conclusion was reached on the express ground that: "No corrupt motive is imputed in connection with these acts, and, at best, they do not show such neglect or inefficiency as to authorize the deprivation of his office." *State v. Bourgeois,* 47 La. Ann. 184 (16 South. 655), and same case in 45 La. Ann. 1350 (14 South. 28). In Idaho it was held that, although the acts charged were illegal, yet the officer "acted honestly and without intent to defraud the county," and was not therefore liable to removal. *Ponting v. Isaman,* 7 Idaho, 581 (65 Pac. 434). In *State v. Hoglan,* 64 Ohio St. 532 (60 N. E. 627), the defendant, a city officer sought to be removed, justified his action under a certain statute, and the court ruled that, although his construction was wrong and he had failed to perform the duty required of him, he was not necessarily removable on that account, saying: "Such errors frequently arise in the performance of their duties by public officers, and it has not hitherto been regarded as an evidence of such incompetency as to require that they should be removed." Speaking of the general nature and effect of a statute permitting the removal of a public officer, the New York Court of Appeals, while conceding the necessity of prompt and drastic action "in cases of established inefficiency or corruption," also say: "The public interests do not require action which shall be unjust to a worthy officer or which will unfairly besmirch a good character." *State v. Sullivan,* 58 Ohio St. 504 (51 N. E. 50, 65 Am. St. Rep. 781). Approaching the subject from still another angle, the

Michigan court has said: "The right to hold this office
is just as sacred in the eyes of the law to Metevier (the
accused) as the right to hold the property he has earned.
It is a property right, and one of which he can be divested
only by a strict conformity to the statute.  . . .  The
people of the county have rights also as well as the accused.
They have the right under the Constitution to elect their
county officers and have such officers serve out the terms
for which they were elected. It was not contemplated by
the Constitution that such officers should be removed but
for grave reasons." *People v. Therrien,* 80 Mich. 187
(45 N. W. 80).

We have not sought to trace this line of adjudication
through all the states, but we have followed it far enough
to show that the clear trend of the cases is opposed to the
position taken by the trial court, and that, when willfulness
is charged as a ground for removing an officer from his
office, his good faith and innocence of intentional wrong
is a question upon which he is entitled to be heard ·in
evidence, and that the truth of such charge is for the jury,
and not for arbitrary disposition by the court. The only
case cited and the only one developed by the research of
counsel which seems to hold that the court may peremptorily
order a verdict of guilty in such cases is *Skeen v. Paine,*
32 Utah, 295 (90 Pac. 440). In that state the statute
provides that, upon being found guilty of charging and
collecting illegal fees, the court must enter judgment
removing the accused officer from his position. Rev.
St. Utah,· 1898, section 4580. The statute does not
provide that the illegal exaction must be willful to
justify the conviction. The defendant in the cited case
was a member of a city council whose legal compensation
was limited to $240 per year, but, acting with other
members, he charged and received greatly increased com-
pensation for official services. Upon the admitted facts,
the court upheld a directed verdict against him. Without

discussing the merits of such holding as a matter of principle, the difference in the statutes being enforced is sufficient to distinguish this authority from those we have before cited. It has no bearing whatever upon the proper interpretation of the word "willful" as employed in the present instance. If it be admitted, as argued, that the primary purpose of the statute is the protection of public interests, it may well be said that those interests are not imperiled by acts of a trifling or unimportant character occasioning no injury against which the personal responsibility and official bond of the incumbent do not afford undoubted security. Such peril arises only when his administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position. That this is the controlling idea of the statute we ourselves have decided. In *State v. Welsh,* 109 Iowa, 21 (79 N. W. 369), speaking by Ladd, J., we said: "The very object of this statute is to rid the community of a corrupt, incapable, or unworthy official." From this exposition of the legislative intent we are not inclined to depart. "The object designed to be reached by a statute must limit and control the literal import of the terms and phrases employed." *State v. Clark,* 29 N. J. Law, 99; 1 Kent's Comm. 462; *Commonwealth v. Kimball,* 24 Pick. (Mass.) 370 (35 Am. Dec. 326); *United States v. Fisher,* 2 Cranch, 358 (2 L. Ed. 304). And see *Cushing v. Winterest,* 144 Iowa, 260; lately decided by us.

Such being the law, let us revert as briefly as may be to the facts to which it is to be here applied. In the discharge of his official duties the defendant was allowed the assistance of a single deputy. This limited force, however sufficient it may have been to perform the ordinary work of the office, was wholly insufficient to attend each day to the increased applications to pay taxes which marked the close of the semiannual tax-paying period provided for by statute. The appellant's duty in collecting taxes was

not confined to the simple receiving of the money due. He was required to issue formal and specific receipts to each individual, to register these receipts in books kept for that purpose, to distribute each payment among the numerous funds to which it belonged, and make accurate and detailed entries thereof in the records and accounts of the office, and, so far as possible, to make each day's record a complete and distinct history of that day's business. When, therefore, on September 30, 1907, the closing day for the payment of the annual tax without added penalty, the office was deluged with hundreds of demands for tax receipts, it was manifestly impossible for appellant and his deputy to meet these demands, receive the taxes, issue the receipts, and complete the record thereof in one short day. As a matter of fact, working with all reasonable diligence and working overtime, they did not succeed in closing the books for September until about noon of October 8th, during which interval, following the usage and custom of the office established long prior to his incumbency, and believing he could rightfully do so, appellant treated the last day of September as still continuing, and, until the accounts for that month were complete, accepted taxes without penalty from such taxpayers as applied to make payment, and receipted for the same under date of September 30th.

There was no corrupt agreement of any kind between him and any of these taxpayers. He received no profit from these transactions, and, indeed, it does not appear that any of the persons paying taxes during this interval made any demand or request concerning the penalties, but he, following, as he offered to show, the practical construction which had been placed upon his statutory duties in the conduct of the office for a period of thirty years, treated the official day of September 30th as closing with the closing of that day's accounts. There is not in the record the slightest suggestion of evil motive on his part. If

his act was a mistake, the uncollected penalties aggregated at most an insignificant sum, against the loss of which the county was protected by a bond of $100,000. No other charge of wrongdoing is supported by any evidence. There is no suggestion that appellant is not in every way competent to fill the office and discharge its duties with efficiency. So far as this case reveals, his personal character stands unimpeached, and his official record is without stain of corruption. To say that such an officer is to be removed in disgrace from the office to which he has been elected by the county in order to vindicate a law, the object of which is as we have said to "rid the community of corrupt, incapable, and unworthy officials," is to sanction a shocking injustice. To so hold is to put it in the power of any envious or maliciously inclined person to endanger the incumbency and heap undeserved reproach upon the most capable and conscientious officer in the public service. It is not given to any man to be absolutely perfect in the discharge of all duty. There is no man in official position so letter perfect in the law that he does not at some point by act or omission or misconstruction of the law, though with perfect integrity of motive, fall short of the strict statutory measure of his official duty. That such technical violations against which an ordinary civil action in damages affords a complete remedy should be classed as impeachable offenses calling for the removal of an officer is intolerable. Our statute books are full of provisions requiring county, city, and township officers to do certain acts at or within a specified time. For instance, the clerk of the district court must report the criminal statistics of his county to the Secretary of State on the first Monday in November in each year. Suppose the clerk to be so delayed by the pressure of other official work that his report is not filed until a day or two after that date has passed, is he guilty of willful misconduct in office? The county auditor is required to make report of

certain expenses to the clerk of the district court on Octo-
ber 15th of each year.  Suppose that, acting in good faith,
he fails to present his report until October 16th, and when
he appears for that purpose the clerk says to him, "I have
not yet closed my books and accounts of yesterday's busi-
ness, and will file your report as of that date," and, this
being done without any wrongful motive and in the belief
that they could rightfully do so, are they both chargeable
with willful misconduct?   Or if, an assessor in the honest,
but mistaken, belief that certain property is not taxable,
omits it from his roll, is he therefore and as a matter
of law subject to removal from his office?

Nor is the force of this illustration avoided by the
contention that such statutes are directory only while the
statute adding penalties to delinquent taxes is mandatory.
To decree that a statute is directory gives no license for
its willful violation, and, if a county treasurer is to be
conclusively held guilty of a willful violation of duty sub-
jecting him to a removal from office for every voluntary
act or omission for which we may find no warrant in
the statute, no matter how clear his honesty of purpose
or how manifest his competency for the position, or how
perfectly the public is protected against injury or loss by
his technical error, then there is no place or point to
draw the line in the administration of any office short
of absolutely perfect observance of the statute, not merely
as it apparently reads, but as the court in its wisdom, or
lack of it, may construe it to read.   If the contention of ap-
pellee is right, the appellant's acceptance of a single pay-
ment of taxes without added penalty after the close of the
calendar day of September 30th was an impeachable offense.
According to this rigid standard of duty, had appellant and
his deputy in their zeal to serve the waiting crowd kept
the treasurer's office open until after midnight of that day,
every tax so accepted after the stroke of twelve was a
willful violation of law calling for his ignominious expulsion

from his position. In our judgment the law calls for no such injustice. The extension of the business or official day beyond the calendar day is a practice of ancient and by no means disreputable origin, and it is not necessarily unlawful, or, if unlawful, it is not necessarily willful. The essential inquiry is whether the record shows the appellant conclusively and as a matter of law guilty of such willful misconduct in office that public interests require his removal. In our opinion no such showing has been made. The willfulness of the act, if wrongful, was a question of fact which the court could not rightfully withdraw from the jury.

Another feature of the case demands our notice. Originally it seems to have been the theory of the lawmakers that each property owner would appear in person at the treasurer's office, and there make payment of his taxes in actual cash. See Code, section 1403. It is not too much to say that literal compliance with this provision if ever practicable has for many years ceased to be so. But a small percentage of the people appear in person to pay their taxes, and a very large proportion do not pay in cash, but by check or other recognized substitutes for legal tender currency. Every county has scattered within its borders cities, towns, and hamlets in each of which one or more banks serve as mediums through which payments are made to the county treasurer. Each bank is supplied or supplies itself with a list of the taxes due from the people of its neighborhood, and serves its customers by receiving their payments and ordering the proper receipts from the treasurer. Naturally the average taxpayer postpones payment till the close of the period is at hand, and the treasurer then finds himself required to deal not only with a flood of applications made directly to him at his office, but with a still greater quantity which come to him by mail, telephone, or telegraph from the banks. Where the orders come in within the proper time, if they

2. SAME.

are from banks with whose responsibility the treasurer is satisfied, he accepts the payment as if made to him in person, even though there be a delay of a day or a few days in completing the actual transmission of the money from the vaults of the bank to the vaults of the treasury. To condemn this long-settled practice as willful misconduct is to brand practically every county treasurer in Iowa as subject to removal from office. We do not suggest for a moment that the treasurer by this use of the banks relieves himself from the strictest personal responsibility for every dollar of such taxes, but we do insist that, while holding him to such rigid liability, he should be left free to conduct the business of his office according to convenient, modern, and improved methods without exposing himself to impeachment for willful or corrupt maladministration.

A new trial must be ordered, and the judgment appealed from is therefore *reversed.*

LADD, J. (dissenting).—The foregoing opinion in effect holds that the conscious intentional disregard of official duty is not ground for removal from office unless there also be proven in addition thereto, an evil or corrupt motive. To this I can not yield assent. Nor do I think the authorities cited go to such limit. Moreover, the statement that defendant was not allowed to show good faith on his part is not borne out by the record. Counsel did make a formal offer to show that for the past thirty years depository banks habitually had ordered tax receipts up to and including the last day of September of each year, crediting the treasurer with the amounts without penalties which uniformly had been accepted by the treasurer. The trouble was this did not meet the cases made against him. No distinction was made between persons for whom tax receipts had been ordered on or prior to September 30th and those who first applied to pay their taxes several days later. It may and often does happen that the treasurer is so pressed with demands that he necessarily must postpone a portion

of the work of making out tax receipts for several days, and, this being without fault of the taxpayer, the imposition of a penalty might be unjust. But, where the application to pay and for the receipt is after the penalty has attached, the treasurer is without excuse if he purposely omit to collect with knowledge that the law requires him to do so and misdates the receipt contrary to statutory mandate, so as to make it appear that none was owing. Pressure of time or difficulties in bookkeeping will hardly excuse the conscious ignoring of a mandatory provision of the statute, especially when in the orderly course of business the entries of payments and preparation of receipts might well have proceeded in the order in which applications for payment were made. As county treasurer, it was defendant's duty to "receive all money payable to the county." On the other hand, it was the duty of every person "subject to taxation to attend at the office of the treasurer" and pay one-half of his taxes before April 1st and the other half before October 1st of each year. Section 1403, Code. "If the first installment of taxes shall not be paid by April 1st the whole shall become due and draw interest as a penalty of one percent per month until paid, from the first of March following the levy; and if the first half shall be paid when due, and the last half shall not be paid before October 1st following such levy, then a like interest shall be charged from the date such last half became delinquent; and the tax with all the penalties shall be collected at the same time and in the same manner." Section 1413, Code. "The treasurer shall in all cases make out and deliver to the taxpayer a receipt, stating the time of payment, the description and assessed value of each parcel of land, and the assessed value of personal property, the amount of each kind of tax, the interest on each and costs, if any, giving a separate receipt for each year; and he shall make the proper entry of such payments on the books of his office." Section 1405, Code.

The delinquencies charged and proven were that de-
fendant received payment of the last half of taxes payable
in 1907 after September 30th and up till about noon of
October 8th of that year from sixty-five different persons
without adding the penalty fixed by the above statute, and,
in violation thereof, dated the receipt to each back to Sep-
tember 30th, thereby concealing the loss to the county
in omitting to collect penalties.   Some payments of taxes
were made into banks on September 30th of which the
treasurer was not advised until the following day, and be-
sides these about three hundred and twenty-five individuals
paid after that date without the penalties being added,
and the dates of the receipts and record were falsified as
stated.   The excuse offered for disregarding the explicit
provisions of the law is that to have exacted penalties and
correctly dated the receipts and the book entries would
have disarranged and confused the books of the office.   How
this would have resulted is not clear.   If because of pressure
of business all receipts for taxes for which remittances
had been received or tendered or payments offered to be
made prior to October 1st could not have been sent out
before that date, this furnished no excuse for including
remittances received on that day or those following con-
cerning which there had been no tender or offer of pay-
ment without adding penalties as provided by law or for
falsely dating the receipts and entries of these subsequent
payments.   Banks, even though designated by the board
of supervisors as depositaries, are not agents of the treasurer
for the collection of taxes, but in forwarding to him act
solely in behalf of the taxpayer.   To avoid the penalty of
delinquency there must be actual payment to the treasurer
or offer of such payment or the deposit of the money for
the payment of specific taxes to his credit and with the
approval express or implied in a designated depository
within the time prescribed in the statute quoted.   But there
was no room for construction in the case at bar.   There

was no misapprehension of the facts nor misconception of the law. On the trial defendant admitted that he knew that the statute imposed on him the duty of exacting the penalty of one percent on all payments received after September 30th, and to date the tax receipts and entries in his books as of the day payments were made. Section 1463 of the Code declares that: "If any auditor or treasurer or other official shall neglect or refuse to perform any act or duties specifically required of him, such officer shall be guilty of a misdemeanor." Could a treasurer's duties be more specifically stated than in the statute quoted?

Several courts have experienced much difficulty in determining whether a technical disregard of the law honestly made where the law is uncertain will furnish ground for removal from office. *Ponting v. Isaman,* 7 Idaho, 581 (65 Pac. 434); *State v. Scates,* 43 Kan. 330 (23 Pac. 479); *State v. Bourgeois,* 47 La. Ann. 184 (16 South. 655); 29 Cyc. 1410. But when the law is unmistakable and the officer acts in plain violation of its express mandate, or omits to do that which it clearly commands, there should be no hesitancy in denouncing such act or omission as "willful." In such a case the evil motive if essential is to be implied. Thus in *State v. Teeters,* 97 Iowa, 458, the charge was that defendant had willfully obstructed the highway, and "willfully" as used in the statute was held to be synonymous with "intentionally," while in *Parker v. Parker,* 102 Iowa, 500, "willful" in the statute punishing trespass in cutting growing timber was held to involve an evil purpose. But one might cut growing timber supposing he rightly could do so, as under the belief it was dead, as was pointed out; while one who places an obstruction in the highway knowing it to be such is without excuse, for the law expressly prohibits the act. In *State v. Sayre,* 129 Iowa, 122, "willful" in a statute denouncing a penalty against an elector who shall willfully vote in a precinct other than that of his residence was held to involve either

knowledge of disqualification or a reckless disregard of whether disqualified or not, and attention was directed to the distinction between ignorance of law as affecting the purpose with which an act might be done and ignorance of fact. In Parker v. Parker, supra, we said that the word when found in penal statutes meant, not only "intentionally or deliberately done, but with a bad or evil purpose as in violation of law . . . or contrary to a known duty." Where an act exacted by the law of a public official is consciously omitted or an act is consciously performed by a public official which is prohibited by law, his conduct should be presumed to have been with an improper purpose as it is inimical to the public good, and is to be regarded willful as a matter of law. Coffey v. Superior Court of Sacramento Co., 147 Cal. 525 (82 Pac. 75); Odin Coal Co. v. Denman, 185 Ill. 413 (57 N. E. 192, 76 Am. St. Rep. 45); State v. King, 86 N. C. 603; U. S. v. Three Railroad Cars, 28 Fed. Cas. 144; U. S. v. Houghton (D. C.) 14 Fed. 544; State v. Perry, 109 Iowa, 353. In Nebraska, where the causes of removal are in substance like those of this state, in an action to remove a surveyor for changing government corners, proof that this was knowingly done was held sufficient. See Bradford v. Territory, 2 Okl. 228 (37 Pac. 1061); State v. Welsh, 109 Iowa, 19. Moreover, the statute in this state is not strictly penal in character. It is essentially remedial and protective. Its purpose is not the award of compensation for injury, nor the recovery of a penalty, nor the infliction of punishment upon the wrongdoer, but to shut off all opportunity for farther transgressions. The language employed in State v. Leach, 60 Me. 58 (11 Am. Rep. 172), where the accused as register of deeds was charged with issuing a false certificate, and the statute authorized removal if found guilty of misconduct in office or incapable of discharging its duties, is pertinent: "It is to be observed, in the first place, that this section is

not one providing for the punishment of the individual offender by fine or imprisonment for an offense against its provisions. It is not in that sense a strictly penal statute. It is rather in the nature of an inquest of office, and the consequences of a conviction under it reach only to the possession of the office · and its emoluments. It seems more like the substitution of the court for the Legislature when acting by impeachment as provided in the section of the Constitution before alluded to. These distinctions may be of some importance in giving a construction to the statute and in determining the limits to be given to the language used. . . . There is a manifest distinction between a case of misconduct resulting in loss of office only, and the charge of a legal crime, which requires proof of criminal intent before conviction and punishment of the person by fine or imprisonment after conviction. In the latter, there must be a direct charge in the indictment of the criminal intent and criminal act. Misconduct does not necessarily imply corruption or criminal intent. We think the Legislature used the word in its more extended and liberal sense. This statute is not, strictly speaking, a penal statute, but rather remedial and protective." See *Shaw v. Macon,* 21 Ga. 280. For these reasons, doubtless the proceedings for removal are civil, not criminal, as in many of the other states. Section 1251 of the Code permits any resident of the county of which defendant was treasurer to make complaint by petition in the name of the state, and section 1254 provides that "the charges when filed shall be tried as a law action and all the proceedings shall as nearly as may be conform to the rules governing the trial of such actions." And, where the evidence is conclusive as in this case, the court may direct a verdict. *Skeen v. Paine,* 32 Utah, 295 (90 Pac. 440).

In my opinion the ruling of the district court was correct, and should be approved.

DEEMER, C. J., joins in the dissent.