STATE OF IOWA ex rel. LEO V. COLLINS, County Attorney, Appellee, v. O. A. GARRETSON, Appellant.

628

FEBRUARY 5, 1929.

*McCoid, McCoid & McCoid,* for appellant.

*Leo V. Collins* and *J. V. Gray,* for appellee.

KINDIG, J.—Basis for this proceeding is found in Section 1091 of the 1924 Code, which reads as follows:

"Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:

"1. For willful or habitual neglect or refusal to perform the duties of his office.

"2. For willful misconduct or maladministration in office.

"3. For corruption. * * *"

The defendant-appellant was an officer duly elected, within the purview of the above and foregoing legislation. He was thus selected in the year 1922. Accordingly, he duly qualified, and  served as supervisor of Henry County from January 1, 1923, until his three-year term expired, when he was again chosen for the posi-

tion, and thereafter acted in that capacity until removed from office by the district court on June 11, 1927. At the commencement of the ouster proceedings, April 18, 1927, this board was composed of three members. They were appellant, Garretson, and Supervisors Barr and Scarff. Nugen formerly had been a member, but was succeeded by Scarff, January 1, 1927. Petitions for removal were filed against both appellant, Garretson, and Supervisor Barr. As a result of the hearing, Barr, as well as appellant, was removed.

This movement against these officers had its origin in the grand jury. That body ordered the appellee, as county attorney, to commence the ouster suit. Causes for appellant's removal are many. Included within them are: First, purchases of lumber in amounts aggregating more than $1,000 without (a) the county engineer's estimate, and (b) advertisement for bids; second, the execution of a contract for material without obtaining a bond from materialmen, as required by statute; third, purchase of paint, steel brushes, and Japan Dryer in excess of $1,000, for the painting of bridges, without (a) the engineer's estimate, and (b) advertisement for bids; fourth, the purchase of a Russell Motor Patrol No. 3, which cost $2,330, without (a) the engineer's estimate, and (b) advertisement for bids; fifth, the decoration and painting of the courthouse, at a cost greater than $2,470, without advertisement for bids; and sixth, the presentation of claims for committee work when the board was in session, and for board work when that body was adjourned. Other allegations are made against the appellant, which we do not consider necessary to discuss in this opinion.

More than one lumber company was dealt with in the manner and way above set forth. It appears that an attempt was made by appellant to avoid the law through the splitting of the various bills for merchandise, so and in order that each portion thereof amounted to less than $1,000. As a matter of fact, such transaction consisted of one, and not several, agreements. Denial of these allegations is made by appellant, and explanation offered for him in reference to each charge made by appellee.

Before proceeding further with the discussion, it is well to here quote the sections of the statute purported to have been violated by appellant in the purchase of the materials aforesaid. These are the following sections of the 1924 Code, respectively:

"4647. All culvert and bridge construction, grading, drainage and repair work, or materials therefor, of which the engineer's estimated cost shall exceed one thousand dollars shall be advertised and let at a public letting. The board may reject all bids, in which event it may readvertise, or may let the work privately at a cost not exceeding the lowest bid received, or build by day labor, subject to the approval of the state highway commission."

"4648. All culverts and bridge construction, tile and tiling, and repair work or materials therefor, of which the engineer's estimated cost shall be one thousand dollars or less, may be advertised and let at a public letting, or may be let privately at a cost not to exceed the engineer's estimate, or may be built by day labor."

"4650. Repair work shall be known as work not designated by the highway engineer, all road construction work costing not in excess of sixty dollars per mile, work of a temporary character, or of immediate necessity, and work necessary to maintain finished roads completed under this chapter."

Also Section 5131 of the same Code, requiring advertisements for bids before repairing a building, is material.

Appellee's case, so far as the purchases of materials are concerned, is predicated upon the proposition that the facts and circumstances in the record sustain the claim that appellant in his official capacity acted willfully and corruptly, in violation of the legislation last above quoted.

A review of the evidence at this point is necessary. The witness Nugen testified that he, together with the former supervisors Barr and appellant, purchased from the Gaynor Lumber Company, through its agent, three carloads of lumber, aggregating $2,925.73 in value. All three carloads were bought at the same time. Mention was made of the fact, during the transaction, that the board could not buy more than $1,000 worth at a time. Arrangement was made to split up the order, so it would appear that each represented a separate and distinct transaction, although, in truth and in fact, it was all one deal. No record of this action of the board's was kept. Apparently appellant and his co-supervisor did not desire the public to know about the affair. Griffith, the county engineer, said that he made no estimate for the lumber. DeWitt, county auditor, stated that there

were no advertisements for bids. Similar testimony was made by Nugen, Griffith, and DeWitt concerning separate transactions with the Standard Bridge Company and the Hoenshel Lumber Company.

Furthermore, oils and gasoline were obtained from the Sunshine and Primary Oil Companies for a consideration exceeding $2,753.19, when there was no engineer's estimate, and no advertisement for bids. Moreover, this contract was entered into without a bond from the Sunshine Oil Company. Likewise, an agreement was made with the Standard Oil Company for certain products, without an engineer's estimate. In addition to the foregoing, the deposed supervisor Barr testified, on cross-examination, that they were to get a half cent per gallon rebate from the driver of the gasoline wagon. Notation of this was not made in the contract, and nothing appeared to apprise the county of its rights in that respect. There is no explanation as to who received this discount. Apparently the county did not. Obviously, the board entered into a contract for the decoration of the courthouse without advertisement for bids, contrary to the statute. Compensation, according to the evidence, was asked by appellant for board work when that body was not in session. So, too, payment was asked by him for committee work when the board was in session. Of course, he could not receive pay for committee work when performing his duties at the session. We have not attempted here to set out all the evidence and other facts and circumstances tending to prove the charges made. An outline only is possible in an opinion.

Appellant, in explanation and contradiction of the foregoing, denied practically every statement and allegation. While he, in effect, admits that certain charges were made for committee work when the board was in session, he suggests that a definite record was not kept concerning the adjournment and reconvening of that body, and what appeared to be an inconsistency in fact was not one. Continuing, he explains that sometimes he served one-half day on the board, and charged for that, and then the balance of the day he spent in committee work, and charged separately for that. Suggestion also is made by him to the effect that, while certain charges were entered for Sunday services, yet such was clearly an error, and was intended for the Saturday before, or the Monday following. Corroboration to some extent

is furnished in this regard by the ousted supervisor Barr. When explaining the apparent illegality relating to the purchase of materials without complying with the statute, appellant suggests that the oil, for instance, was bought on an option contract, and that the county was not required to accept the entire allotment. Commenting upon the State's accusation regarding the lumber contracts, appellant, the witness Barr, and the Gaynor Lumber Company representative assert the transaction was not one, but three, and that no illegal splitting occurred. On another occasion, appellant and Barr say that one of the lumber companies made an error in shipment, in that more lumber was sent than was authorized. However, all was paid for at the same time. Such is the evidence which was presented to the district court, and that tribunal found in favor of appellee.

Insistence is also made by appellant that the supervisor Nugen and the engineer who testified against him are prejudiced and unfair. After reading and considering the entire record, we are inclined to agree with the trial court. Prejudice and ill will on the part of appellee's witnesses do not appear to be well founded in the record to the extent of suggesting perjury. Explanations offered by appellant are such as to arouse the suspicion of attempted evasion. The illegality complained of did not occur once, but continually and repeatedly. During all the time, appellant, according to the evidence, was fully aware of the statutory requirements in the premises.

I. Did he thus subject himself to the removal statutes? Answer to that inquiry must be found in the requirements of Section 1091, supra. Important in this consideration is the word "willful," contained in the legislation. Not every mistake, inattention to duty, or failure to comply with the statute amounts to a "willful or habitual neglect or refusal to perform the duties of his office," or "willful misconduct or maladministration in office," or "corruption." *State ex rel. Kirby v. Henderson*, 145 Iowa 657; *State ex rel. Gebrink v. Hospers*, 147 Iowa 712; *State ex rel. Barker v. Meek*, 148 Iowa 671; *State v. Roth*, 162 Iowa 638; *State ex rel. Cochran v. Zeigler*, 199 Iowa 392. Apt language in *State ex rel. Barker v. Meek*, supra, is:

"If it be admitted, as argued, that the primary purpose of the statute is the protection of public interests, it may well be said that those interests are not imperiled by acts of a trifling or

unimportant character, occasioning no injury against which the personal responsibility and official bond of the incumbent do not afford undoubted security. Such peril arises only when his administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position. That this is the controlling idea of the statute, we ourselves have decided.''

Subsequently, *State v. Roth*, supra, concludes:

" 'Willfully' has been held to mean intentionally, deliberately, with a bad or evil purpose, contrary to known duty.''
*State ex rel. Cochran v. Zeigler*, supra, continues:

''To constitute a ground for the summary removal of a public officer, the acts and conduct thereof must have been willful, and such as to amount to a maladministration in office. The standard fixed by the statute for the removal of a public officer is not the mere violation of the statute; but the violation, to constitute a ground for removal, must be willful and with an evil purpose. The word 'willful,' as used in this connection, was held, in *State v. Meek*, 148 Iowa 671, to imply knowledge on the part of the officer, together with a purpose to do wrong. * * *''

II. Manifestly, the statute is for the public benefit, and when it is willfully violated, ''with a bad or evil purpose, contrary to known duty,'' the offender can be removed from office. *State v. Roth*, supra; *State ex rel. Cochran v. Zeigler*, supra.

When does such malfeasance occur? An answer to this interrogatory can be found in *State ex rel. Barker v. Meek*, supra, in these words:

''Such peril arises only when his [the officer's] administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position.''

By way of a safeguard, it was further suggested in *State ex rel. Cochran v. Zeigler*, supra, as follows:

''In saying this, we do not mean to minimize the violation of a statute by a public official, who should, in all things, observe strictly his official duty. The statute in question is, as already indicated, based upon sound principles of public policy. Even

634

the willful violation of a statute without profit to the officer violating it, or without disadvantage to the municipality, might, under some circumstances, constitute a good ground for the summary removal of such officer."

III. Does appellant's conduct, as here disclosed, come within this rule permitting his removal from office? Clearly so. To begin with, throughout his tenure in office, he understood his duty, and knew the legal requirements relating thereto. Ignorance in that respect cannot assist him here. Repeatedly, appellant persisted in letting public contracts without the engineer's estimate and advertisements, in direct violation of Sections 4647 and 4648, supra. How can it be said that the county was not prejudiced? Who knows? Answer to these questions cannot be known without the advertisements, and the resulting opportunity for prospective materialmen to bid. It is not for appellant to say that no good reason exists for the requirements of this law. The prerogative to decide the wisdom of those legislative enactments is confined to the lawmakers, and they deemed the legislation wise, and adopted it. Even though, under the rule announced in *State ex rel. Cochran v. Zeigler*, supra, the public need not be harmed, yet detriment did occur to the county in the case at bar. For not only were public contracts illegally entered into, but the funds of the county were wrongfully taken from the treasury. Beyond a peradventure of a doubt, this conduct on the part of appellant was willful. All the circumstances surrounding the facts substantiate that conclusion.

No records were kept concerning many of these items. Unverified bills were allowed, unjust claims paid, and incorrect accounting appears so often as to be the rule, rather than the exception. Consequently, appellant's misconduct was marked by graveness, and it demonstrated his unfitness for the position, as required by the authorities above cited. Mere accident or mistake does not appear in this respect, but rather, throughout his administration, appellant persisted in and connived at statutory evasion and maladministration.

Plainly, this behavior on appellant's part is embraced within the provisions of Section 1091, supra, and his removal from office because thereof is sufficiently substantiated both in the law and the facts.

IV. Argument, however, is made by appellant upon the proposition that the statute does not necessarily require the engineer's estimate and the advertising, under the facts and  circumstances here presented. Foundation for this premise is laid in the thought that it was the practice of the supervisors of Henry County to maintain what is known as a public lumberyard, from which material was taken, from time to time, as needed on repair work. Following this idea, appellant suggests that "repair work" under $1,000 need not have the advertisement or engineer's estimate. Authority for this contention is found by appellant in Sections 4648 and 4650, supra. Conclusion then is drawn by him that, although a specific contract for lumber exceeds $1,000, there is no statutory violation if it is placed in the lumberyard and divided into portions each less than $1,000 in value, to be used on separate repair projects from time to time.

Very evidently such interpretation of the statutory requirements is erroneous. Sections 4647 and 4648, supra, both contemplate an engineer's estimate, regardless of whether or not the repair work is more or less than $1,000. It is the engineer's estimate that determines the value in this regard. Definition of "repair work" is found in Section 4650, supra, to this effect: "Repair work shall be known as work not designated by the highway engineer * * *." A distinction clearly appears in the statutes referred to, between "designation" and "estimate." "Designation," as used in the statute, marks the dividing line between the work needing the skill and knowledge of an engineer and that which does not. But all repair work, whether the value thereof is below or above $1,000, is supposed to have the engineer's estimate, under Sections 4647 and 4648, supra. Anyway, the contracts complained of in the case at bar did exceed $1,000, and they were for such work as requires an engineer's estimate, under 4647 and 4648 of the Code. Subsequent division of the original contract is nothing more than a subterfuge, to avoid an express statute.

What is said in reference to the lumber applies very largely to contracts for oil and gasoline; and the agreement in reference to repairing and decorating the courthouse was clearly illegal, because there was no advertisement for bids.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.